BARCLAY v. GENERAL MOTORS CORP.

WORKMEN'S COMPENSATION—HERNIA—FINDING OF DEPARTMENT—EVIDENCE.

Plaintiff was not entitled to compensation for hernia under the occupational disease amendment of the workmen's compensation act where there is evidence to support finding of the department of labor and industry that the hernia could not have been recent in origin notwithstanding the fact the condition was not previously disabling (Act No. 10, pt. 7, § 2, subd. 28, Pub. Acts 1912 [1st Ex. Sess.], as added by Act No. 61, Pub. Acts 1937).

STARR and BUSHNELL, JJ., dissenting.

Appeal from Department of Labor and Industry. Submitted June 8, 1944. (Docket No. 24, Calendar No. 42,596.) Decided October 11, 1944.

James Barclay presented his claim against General Motors Corporation (Pontiac Motor Division) for compensation for hernia. Award to defendant. Plaintiff appeals. Affirmed.

*Maurice Sugar* and *Benjamin Marcus,* for plaintiff.

*Henry M. Hogan* (*E. H. Reynolds*, of counsel), for defendant.

BUSHNELL, J. (*dissenting*). The sole question presented in this appeal, in the nature of certiorari from the department of labor and industry, is stated by plaintiff and appellant James Barclay as follows:

"Is the recent aggravation of a pre-existing nondisabling hernia, which aggravation causes total disability, compensable under the workmen's compensation law?"

Appellee and defendant Pontiac Motor Division, General Motors Corporation, prefers to state the question in this manner:

"Was plaintiff's hernia clearly recent in origin so as to be covered under paragraph 28 of section 2, part 7 of the workmen's compensation law?"

Barclay has been employed by defendant since 1935. In October of 1942, aided by a fellow employee, he picked up a breech case, weighing approximately 100 pounds, and placed it in a fixture for checking. As he did so, he felt something break in his left groin. He reported the incident to his foreman, who sent him to the first-aid station. The following day he returned to work, wearing a support, and was placed on a lighter job. About 15 days later the pain became so severe that Barclay was unable to continue his work. A physician who examined him the next day advised a herniotomy. This operation was performed in November and Barclay returned to work in January. He sought compensation for that period and for his medical and hospital expenses under the provisions

of part 7 of the workmen's compensation act, generally known as the "occupational disease amendment."

There is some indication that Barclay had a hernia in 1931, and there is no question about the fact that in 1936 he sustained a left inguinal hernia, which was repaired. Dr. Ethan B. Cudney, the industrial surgeon of defendant company, who examined Barclay on October 15, 1942, said that his examination revealed a hernia "so large that it practically obliterated the scrotum," and he stated that, in his opinion, the hernia "had been there for several years, four or five years, maybe longer." He testified in part as follows:

"I have never seen a hernia as large as Mr. Barclay has, that hadn't been present for a matter of, I would say, a matter of years. I don't think it is a matter of days or a matter of weeks; a hernia that large could not happen in a matter of two or three weeks and still have the man continue to be on his feet, and it would take a tremendous—it would be a tremendous amount of disability. In fact, it would be practically a fatal thing to have a hernia develop in a few weeks to the size Mr. Barclay's was when I examined him. In fact, most of the time hernias, or acute hernias, are very small, and we sometimes have to make several examinations to determine whether there is a hernia present or not."

Dr. Howard B. Barker, who testified in behalf of plaintiff, examined Barclay on October 20, 1942, and performed the herniotomy in November. He found "a large left inguinal hernia on the left side, with numerous adhesions between the various layers of the abdominal wall." He stated that a strain might have increased Barclay's disability, and that "usually a sudden pain on straining, in

the inguinal region, means the separation of muscle or the tearing of adhesions, if they are present." On cross-examination he testified that "the presence of adhesions and the thickness of the neck of of the sac would indicate that a hernia had been present for some time." He stated that from the history he obtained from Barclay he "judged that he had had something there, that his abdominal wall had not been intact since the disturbance four months after his second operation," and that "he had a hernia for some time, in other words, for several years." On redirect examination he said: "Accepting the history as given, I would say that he must have had some—some change in the condition of the inguinal canal as a result of the strain." On recross he answered that what he found would indicate that the swelling or lump had been present for some time; and, on redirect, replied to the inquiry as to whether or not the recurrence was old, that: "You can only make a relative statement. You can't tell how old nor you can't tell exactly how young."

The deputy commissioner then asked Dr. Barker about the adhesions, to which he replied:

"In the hernia, you have three layers, primarily; you have the peritoneum, which is the sac itself; you have the internal oblique muscle and you have the external oblique fascia, which [is] the media portion of the external oblique muscle. In doing an operation for hernia, you open the external oblique fascia, you divide or separate the fibers of the internal oblique muscle from the portion of Poupart's ligament, and you dissect out the peritoneal sac. You remove the peritoneal sac, close the neck, suture the internal oblique muscle to the shelving portion of the Poupart's ligament, by means of some type of suture material, either absorbable or nonabsorbable, and you close the opening in the ex-

ternal oblique fascia. You can't do that in any hernia without leaving adhesions. That is, there are adhesions between the various layers after you do that operation, between the peritoneal layer and the internal oblique, between the internal oblique and the external oblique fascia, and of course each time that an operation is done, if you have two operations, you have more adhesions than you do with one operation, so that there are adhesions between the peritoneum and the internal oblique, and between the external oblique fascia and the internal oblique muscle.''

The deputy commissioner concluded that the hernia was not of recent origin, and denied compensation. On review, the department considered that, although *Riley* v. *Berry Brothers Paint Co.*, 293 Mich. 500, involved the question of whether the claimant promptly reported a hernia, this authority was directly in point and, after quoting at length from the court's opinion, concluded that:

''Inasmuch as plaintiff had a left inguinal hernia prior to the incident of October 14, 1942, that condition could not have been recent in origin notwithstanding the fact the condition was not previously disabling.''

The department held that:

''A recent aggravation of a pre-existing hernia which causes total disability is not compensable under section 2 of part 7 of the workmen's compensation act,''

and affirmed the award of the deputy commissioner, disallowing compensation.

Hernia was defined in *Robbins* v. *Original Gas Engine Co.*, 191 Mich. 122, as follows:

''All the experts seem to agree that the visible evidence of the hernia is the protrusion through the

inguinal ring of the peritoneum and its contents; 'the hernia is the peritoneum going through, accompanied by the intestines or some other substance.' "

The court further said:

"But the testimony for respondents is to the effect that the peritoneum is incapable of sudden, and is capable of very gradual, extension; that the sudden complete development of hernia in a pathological sense is impossible, but the hernia may be felt—the sudden projection of hernial contents into the preformed sac—for the first time during a straining effort. Various medical authorities to which the court is referred appear to sustain the proposition that hernia is of slow formation and can never arise from a single augmentation of intra-abdominal tension, however great it may be."

Under the workmen's compensation law (Act No. 10, Pub. Acts 1912 [1st Ex. Sess.], 2 Comp. Laws 1929, § 8407 *et seq.* [Stat. Ann. § 17.141 *et seq.*]), compensation for hernia could only be "allowed because of some unusual, fortuitous, or unexpected happening which caused the injury and which was in essence accidental in character." *Kutschmar* v. *Briggs Manfg. Co.,* 197 Mich. 146 (L. R. A. 1918 B, 1133). See, also, *Nagy* v. *Solvay Process Co.,* 201 Mich. 158, and *Sjoholm* v. *Hercules Powder Co.,* 227 Mich. 610.

The so-called occupational disease amendment (Act No. 61, Pub. Acts 1937 [Comp. Laws Supp. 1940, § 8485–1 *et seq.,* Stat. Ann. 1942 Cum. Supp. § 17.220 *et seq.*]) added a new part 7 to the workmen's compensation law and provided for compensation for disability arising from 31 specified "occupational diseases," among them being No. 28, Hernia, "clearly recent in origin and resulting from a strain, arising out of and in the course of employ-

ment, and promptly reported to the employer."
*Riley* v. *Berry Brothers Paint Co., supra.*

By Act No. 245, Pub. Acts 1943 (Comp. Laws Supp. 1943, § 8485-1 *et seq.,* Stat. Ann. 1943 Cum. Supp. § 17.220 *et seq.*), part 7 was amended by striking therefrom the 31 specific diseases covered, and providing for compensation for any disease or disability "due to causes and conditions which are characteristic of and peculiar to the business of the employer, and which arises out of and in the course of the employment." To this was added the following:

"Ordinary diseases of life to which the public is generally exposed outside of the employment shall not be compensable: *Provided, however,* That a hernia to be compensable must be clearly recent in origin and result from a strain arising out of and in the course of the employment and promptly reported to the employer."

Thus the limitation on compensation as it existed at the time of Barclay's claimed hernia was retained in the law by the 1943 amendment, although in slightly different language.

Our problem is to determine whether the department correctly applied the 1937 limitation to the facts in Barclay's case.

A helpful discussion may be found in Detroit Law Review of November, 1933, vol. 4, p. 13, in an article entitled, "Hernia in Workmen's Compensation Cases."

In the solution of this problem we must first determine the intent and meaning of Act No. 61, § 2, item 28, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485-2, Stat. Ann. 1942 Cum. Supp. § 17.221), which determination is also applicable to section 1, paragraph (c) of the same act, as amended by Act No. 245, Pub. Acts 1943 (Comp. Laws Supp. 1943, § 8485-1, Stat. Ann. 1943 Cum. Supp. § 17.220).

Neither the act of 1937 nor the act of 1943 precludes an award of compensation for hernia resulting from an accident or the intervention of an "unusual, fortuitous, or unexpected happening which caused the injury and which was in essence accidental in character." *Kutschmar* v. *Briggs Manfg. Co., supra,* 150. These amendments to the compensation law extend the right of compensation to those situations in which the accidental element is lacking and should be applied, in so far as legislative intent permits, to instances of aggravation of nondisabling hernias, such as that described in *Paridee* v. *Great Atlantic & Pacific Tea Co.,* 278 Mich. 191, where, prior to such amendments, compensation was not permissible. Any other holding would prevent those so situated from obtaining employment and performing gainful work. At the same time, it was undoubtedly the intent of the legislature, particularly in view of the new section added by Act No. 264, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485–14, Stat. Ann. 1940 Cum. Supp. § 17.230 [3]), effective October 29, 1937, which provided for hernia waiver within 120 days from the effective date of this act, *Barry* v. *Briggs Manfg. Co.,* 296 Mich. 137, to avoid the burden of compensation for pre-existing hernias and to permit employment of those so situated. It is obvious, although the legislature did not say so, that common sense dictates that the employer would protect itself by proper physical examination of new employees. In short, the legislature sought, and we think effectively, to provide compensation for those employees who suffer a loss of earnings by reason of, not only a subsequent hernia, but also those whose pre-existing, nondisabling hernia becomes aggravated. *Lohrman* v. *Haven-Busch Co.,* 293 Mich. 143.

If the department in the instant case had arrived at its conclusion by reason of a finding that Barclay's hernia existed prior to the time of his disablement, there would be nothing left for us to say. However, the department did not do this. It concluded that "a recent aggravation of a pre-existing hernia which causes total disability is not compensable," and this solely because Barclay "had a left inguinal hernia prior to the incident of October 14, 1942." Such holding is legally erroneous in view of our construction of the statute. Nevertheless, we should not substitute our judgment on the factual aspects of the case for that of the department, but rather the department should pass upon the factual situation.

We have heretofore pointed out, by quotations from the testimony, the difficulties encountered in such determination. Our view in this respect has been frequently expressed, and in amplification of that view we adopt with approval the language of the supreme court of Wisconsin in *McCarthy* v. *Industrial Commission of Wisconsin,* 194 Wis. 198 (215 N. W. 824), as follows:

"It appears not only from the statement filed by the industrial commission in this case, but from an examination of the workmen's compensation reports, that the industrial commission is frequently called upon to deal with hernia cases, and that they are perhaps the most troublesome cases with which the commission comes in contact. This is due to the fact that inguinal hernia is rarely of traumatic origin, but that it has a gradual development, and its final culmination is frequently, if not generally, due to some strain which can be said to be incidental in its nature. The frequency of these cases has enabled the members of the industrial commission to become thoroughly familiar with the nature, development, and progress of the ailment, and they

bring to the consideration of such cases a knowledge and experience which enables them to pass most discriminatingly upon the evidence produced. It is scarcely too much to say that they are experts upon the subject. At any rate, none can deny that they are far better qualified to draw proper inferences from the physical facts than those who do not possess the peculiar knowledge of the subject which they have acquired by reason of their experience and contact with hundreds of such cases. * * * The convincing power of expert testimony depends somewhat upon the knowledge and experience of the one who is called upon to weigh such testimony. The untutored are likely to accept the opinion of an expert at its face value, while those possessing knowledge upon the subject concerning which he testifies may discount it or entirely disregard it as unsound."

The award of the department of labor and industry should be vacated and the matter remanded to the department for further consideration of the factual aspects of the case, in conformity with this opinion. It should be so ordered, with costs to appellant.

STARR, J., concurred with BUSHNELL, J.

WIEST, J. (*for affirmance*). I am of the opinion the holding of the department should be affirmed.

Plaintiff's right to an award, if any, is under the provisions of the statute as it stood in 1937 (Act No. 61, Pub. Acts 1937 [Comp. Laws Supp. 1940, § 8485-1 *et seq.*, Stat. Ann. 1942 Cum. Supp. § 17.220 *et seq.*]), and the act of 1943, cited by my Brother, has no bearing upon the issue in this case. Was the hernia of recent origin? A recurrent hernia is not a hernia of recent origin.

The department found that the disabling hernia suffered by plaintiff was a recurrence of a former hernia in 1936, and the evidence at the hearing, inclusive of plaintiff's own testimony, establishes beyond cavil such to be the fact. Plaintiff admits that he had a hernia in the same groin in 1936 and then had an operation at a hospital and by direction of his doctor wore a support for about nine months and at times, later, it pained and swelled to the size of a small egg. After the hernia in 1942, plaintiff went to the company doctor who examined his condition and took his history but did not perform an operation. The doctor testified:

"I have never seen a hernia as large as Mr. Barclay has, that hadn't been present for a matter of, I would say, a matter of years. I don't think it is a matter of days or a matter of weeks; a hernia that large could not happen in a matter of two or three weeks and still have the man continue to be on his feet, and it would take a tremendous—it would be a tremendous amount of disability. In fact, it would be practically a fatal thing to have a hernia develop in a few weeks to the size Mr. Barclay's was when I examined him. In fact, most of the time hernias, or acute hernias, are very small, and we sometimes have to make several examinations to determine whether there is a hernia present or not."

Dr. Howard B. Barker testified that he examined and operated on plaintiff; that October 20, 1942, plaintiff "had a left inguinal hernia, recurrent;" that plaintiff "had a large left inguinal hernia on the left side, with numerous adhesions between the various layers of the abdominal wall." At the time of the operation he found plaintiff "had a large sac with a large neck or opening, sac showed considerable peritoneal fat around it. There were adhesions between the muscle, the adjacent muscle and

the neck of the sac, and adhesions between the various layers of muscle, or external oblique fascia and the internal oblique muscles," which indicated "that there had been a previous disturbance of the muscles and, of course, in this case, we assumed that the previous disturbance was the previous operation," and the adhesions and a portion of the neck of the sac being thick would indicate that the hernia had existed for some time.

Plaintiff testified that following the operation in 1936, the hernia had been getting worse and started to bother him just a few months after he went back to work and has bothered him "on and off, all along;" that he first noticed the swelling more than a year "after I had taken the last injection," which "would be somewhere around * * * 1937 or 1938."

The denial of an award is affirmed, with costs to defendant.

NORTH, C. J. (*concurring in affirmance*). As to plaintiff's hernia the department found: "that condition could not have been recent in origin notwithstanding the fact the condition was not previously disabling." There was testimony to sustain this finding. It follows that plaintiff is not entitled to compensation because his hernia was not "clearly recent in origin" as required by the statute. Act No. 10, part 7, § 2, subd. 28, Pub. Acts 1912 (1st Ex. Sess.), as added by Act No. 61, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 8485-2, Stat. Ann. 1942 Cum. Supp. § 17.221). For this reason I concur with Mr. Justice WIEST in affirmance, with costs to defendant.

BUTZEL, SHARPE, BOYLES, and REID, JJ., concurred with NORTH, C. J.