[Civ. No. 5795. Third Appellate District.—March 24, 1937.]

VERONICA GRIFFIN et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Faulkner, Doyle & Sanford and J. Oscar Goldstein for Petitioners.

Everett A. Corten, Jerome D. Peters and Keith & Creede for Respondents.

THOMPSON, J.—This is a proceeding to review an order of the Industrial Accident Commission denying the petition of the surviving widow and child of John Francis Griffin, deceased, to reopen for further hearing, under the provisions of section 20 (d) of the Workmen's Compensation Act, their application for compensation for his death which occurred incident to his employment with the Gilmore Oil Company. The applications for compensation and for rehearing of the proceeding were denied.

The commission found that Mr. Griffin did not meet his death as a result of injuries sustained in the course of his employment for the reason that at the time of his death he was violating instructions from his employer not to use its automobile or engage in its business after ten o'clock at night. For that reason the application for compensation and the petition to reopen the hearing were denied. The deceased was killed while driving his employer's machine at three o'clock in the morning. The only question which is involved in this proceeding is whether the violation of the employer's instructions constituted a waiver of compensation under the terms of the Workmen's Compensation Act on the theory that he was not then acting within the scope of his employment.

The respondents concede that Mr. Griffin was engaged in performing service for his employer at the time of his death.

John Francis Griffin was employed as branch manager of the Gilmore Oil Company with his headquarters at Chico. It was his duty to supervise and check on all Gilmore gas

stations in that district and to negotiate for other agents. John Henderson who had maintained a Gilmore station at Oroville contemplated disposing of it. For ten days prior to the time of the accident which caused his death, Mr. Griffin had been negotiating with Desmond R. Dowdall to persuade him to take control of the Henderson station. Dowdall had been working for Ferrabee and Beilby at their ''Lion's Den'' Gilmore station at Paradise. That station had just been destroyed by fire. Griffin proposed to take Dowdall to inspect the Henderson station at Oroville with the purpose of inducing him to lease the property. Dowdall agreed to accompany him. They left Chico on the afternoon of July 23, 1934, spending several hours in examining the pumps and property of the ''Lion's Den'' station to ascertain the damage which resulted from the fire and to determine the repairs which were necessary to restore the station. They met Mr. Beilby at that station. He was a friend of Dowdall, who had great confidence in his judgment. By agreement Griffin took Dowdall and Beilby to Oroville to inspect the Henderson station. They arrived at Henderson's station about seven o'clock in the evening. They spent about four hours checking the books and property of that station. Dowdall was favorably impressed with the proposal to take charge of the property. Griffin proposed taking Dowdall and Beilby to Mealey's Italian Village near by for a lunch before they returned home. Griffin made that suggestion for the double purpose of persuading the proprietor of that inn to aid Dowdall in securing a profitable business if he assumed charge of the Henderson gas station, and to obtain something to eat. Dowdall was introduced at the inn as the prospective purchaser of the Henderson property. Griffin asked them to help Dowdall secure customers for the station. The three men ordered lunches and remained at the inn until one or two o'clock, eating and drinking some beer. It is not contended that any of them became intoxicated. The proprietor, his wife and a waitress testified that they overheard Griffin and his companions talking of the transfer of the Henderson station to Dowdall. It is conceded that Griffin was engaged during all of this time in negotiating with Dowdall to lease this property for the benefit of the Gilmore Oil Company. Finally they left Mealey's Italian Village for home by way of Oroville and Paradise. It was dark. Griffin was driving

the company's automobile. They reached an intersection of the highway at Neil's grade about three o'clock in the morning. Near that point the automobile struck a concrete abutment of a bridge. The machine was badly damaged. Dowdall was seriously injured and Griffin was killed as a result of the accident. In a suit which was subsequently brought, Dowdall recovered damages against the Gilmore Oil Company on the theory that he was injured through the negligence of its agent, Griffin. On appeal that judgment was affirmed by this court. (*Dowdall* v. *Gilmore Oil Co.*, 18 Cal. App. (2d) 1 [62 Pac. (2d) 1051].) The widow and daughter of the decedent, Griffin, applied for compensation, which was denied by the Industrial Accident Commission on the ground that Griffin was not killed while he was engaged in the course of his employment. The petition for a rehearing was denied, and this proceeding for a writ of review was then instituted.

We are of the opinion John Francis Griffin died as the result of injuries received in the performance of his duties as branch manager of the Gilmore Oil Company while he was acting in the course of his employment, and that his widow and minor child are entitled to compensation therefor under the provisions of the Workmen's Compensation Act. The evidence does not show a violation of the spirit of the instructions which he received from his employer. Even though his conduct be deemed to have been a technical violation of his instructions, it does not appear that his acts increased the employer's hazard, and such misconduct will not deprive the decedent's widow and minor child of their right to compensation on account of his death.

It is true that the division manager of the Gilmore Oil Company and his assistant testified that several months before the accident occurred they instructed the decedent that he had been seen sleeping in his car parked by the roadside in the night-time; that such conduct would be damaging to the reputation of their company, and that thereafter he should not sleep in his machine by the roadside at night, nor call upon their dealers or engage in company business or use the company's automobile "*under ordinary circumstances* after nine or ten o'clock" at night. Mr. Charles B. Garrison, the division manager, did testify that:

"I instructed him that in the future he shouldn't be on the road after this after nine or ten o'clock. Before he left he said he understood it."

This statement was later modified and explained by saying that he told the decedent "he shouldn't be on business *under ordinary circumstances* after nine or ten o'clock".

Mr. Garrison gave as his reason for so instructing the decedent that "he was driving late at night, that he parked his car on the highway and went to sleep, that the car was stopped and people stopped and observed and found a man asleep in the car".

It is apparent that it was not the purpose of the division manager to specifically limit the time during which Griffin was to be employed, nor to definitely terminate his work at nine or ten o'clock at night. On the contrary, it is very clear that to prevent possible detriment to the reputation of their company by Griffin's conduct of sleeping in a car parked by the roadside at night, the manager intended to reprimand him and to warn him against continuing that practice. It is evident that the manager understood and in his instructions took into consideration the fact that the very nature of Griffin's duties frequently required him to work at late and unusual hours. For that reason he told him that "he shouldn't be on business *under ordinary circumstances* after nine or ten o'clock". The fact that a definite time at which he was to cease working was not fixed indicates that a discretion was left with the deceased to determine whether the exigency of a particular transaction required him to work later than ten o'clock at night. A master who desired to terminate a servant's service at a specified time of day would not be so indefinite as to say his services would be terminated at either "nine or ten o'clock". That is absurd. It is very convincing that the instructions received by the deceased did not amount to a definite termination of employment at nine or ten o'clock at night. The transaction which was under consideration at the time of the accident certainly did not involve merely "ordinary circumstances". It was unusual in its nature. It may therefore reasonably be considered an exception to the general instructions which the decedent received. It will be observed that Griffin did not "call" on Henderson, their dealer, after ten o'clock at night. He called upon him between seven and eight o'clock in the evening, but he remained until about eleven o'clock checking the books and property in his effort to persuade Dowdall to lease the gas station for the benefit of his employer. It is true that Griffin

was on the road in his employer's automobile after the hour of ten o'clock at night for the necessary completion of his task.

Under the circumstances of this case it was not a violation of the instructions of his employer for Griffin to have remained engaged in trying to procure a transfer of the Henderson station to Dowdall, and to be using the company machine until approximately three o'clock in the morning. If his conduct be deemed to have been a technical violation of instructions that misconduct may not be urged by the employer as a defense to the claim of the decedent's widow and minor child for compensation on account of his death.

Numerous authorities in this jurisdiction and elsewhere hold that the violation of instructions regarding the time, place or manner of performing work does not necessarily defeat the employee's claim to compensation for injuries received under such circumstances. That is particularly true where the statute specifically provides, as it does in California, for compensation for *any injury sustained in the course of the employment.* Section 6 of the Workmen's Compensation Act provides in that regard:

"Liability for the compensation . . . shall . . . exist against an employer for any injury sustained by his employees *arising out of and in the course of the employment. . . .*

" (2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his employment and is acting within the scope of his employment."

Certainly driving a prospective purchaser of a Gilmore gas station to his home after spending several hours in persuading him to lease the plant is service incident to and growing out of the scope and course of the employment of a branch manager of the oil company whose duty it is to procure leases and transfers of gasoline stations for his employer.

The question as to whether an employee is engaged in the performances of services "in the course of his employment" depends upon the circumstances of each particular case. The phrase "in the course of employment" is frequently defined as such service as the employee is expected to render, when it occurs within the period of his employment, at a place where he may reasonably be for that purpose, and while he is engaged in fulfilling his duties or in doing something necessarily incident thereto. The term ordinarily refers to the

time, place and circumstances under which the accident occurs. The phrase is entitled to a liberal construction to conform with the humanitarian purpose for which workmen's compensation acts are adopted. (71 C. J. 658, sec. 404.)

When an employee is engaged in performing the service for which he is hired, in the absence of strict regulations to the contrary, he will not forfeit his right to compensation merely because he is injured while he is working beyond the prescribed time for the cessation of his daily employment. In 71 C. J. 693, section 436, it is said:

"Where the statute by its terms embraces all injuries by accident arising out of and in the course of the employment, *it is immaterial that the injury occurred outside of working hours.*"

In *Perdew* v. *Nufer Cedar Co.*, 201 Mich. 520 [167 N. W. 868], an award of compensation for damages was sustained on appeal for injuries received by an employee at ten o'clock at night, after working hours had passed, while he was engaged in assisting another employee of the same company in repairing a machine in the employer's shop.

To the same effect is the case of *Geibig* v. *Ann Arbor Asphalt Const. Co.*, 238 Mich. 560 [214 N. W. 90].

■ Conceding for the sake of argument, without so deciding, that Griffin violated the instructions of his employer by using its machine for business purposes after ten o'clock at night, it does not appear that this conduct increased the hazard, for the accident might have occurred in the same manner if he had been driving along that same highway prior to ten o'clock at night. Moreover, a mere violation of instructions regarding the usual time for ceasing to labor merely amounts to misconduct on the part of the employee, and the California statute specifically provides that wilful misconduct of an employee may not be urged as a defense against the claim of dependents of the servant who died from injuries received in the performance of his duties. Section 6 (a) (4) of the Workmen's Compensation Act provides in that regard:

"Where the injury is caused by the serious and wilful misconduct of the injured employee, the compensation otherwise recoverable by him shall be reduced one-half; provided, however, that such misconduct of the employee *shall not be a defense to the claim of the dependents of said employee, if*

*the injury results in death,* or to the claim of the employee, if the injury results in a permanent partial disability equaling or in excess of seventy per cent of total; . . . ''

We are therefore of the opinion the Industrial Accident Commission exceeded its jurisdiction in denying compensation to the widow and minor child of John Francis Griffin, deceased, under the circumstances of this case; that he died as a result of injuries sustained while he was performing service in the course of his employment; that he did not violate the spirit of the instructions which he received from his employer; and that if it be deemed that he did violate instructions not to remain out with its machine in the performance of business for his employer after ten o'clock at night that violation under the circumstances of this case will not defeat his widow and minor child from recovering compensation on account of his death.

The orders denying an award of compensation and refusing to reopen the proceeding for further hearing are annulled and the commission is directed to award the petitioner such compensation as is proper under the facts of this case.

Pullen, P. J., and Plummer, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 20, 1937.